ESTATE OF FOY PROCTOR, DECEASED, FIRST NATIONAL BANK OF AMARILLO, INDEPENDENT EXECUTOR, Petitioner, BETH HAYS, CLYNICE BAKER, AND TEXAS TECH UNIVERSITY, Intervenors v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Proctor v. Commissioner
Docket No. 10462-92
United States Tax Court
T.C. Memo 1994-208; 1994 Tax Ct. Memo LEXIS 218; 67 T.C.M. (CCH) 2943; May 11, 1994, Filed *218 Decision will be entered under Rule 155. For petitioner: Thomas H. Cantrill and Andrius Kontrimas. For Beth Hays and Clynice Baker, intervenors: Donald P. Lan, Jr., Jack M. Kinnebrew, Rowland Foster, and Thomas L. Burdett.
For Texas Tech University, intervenor: William R. Cousins III, Robert Don Collier, and Robert M. Bolton. For respondent: Henry C. Griego. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 4,323,330. Petitioner is the Estate of Foy Proctor (decedent). After concessions by the parties, [1] the primary issue for decision is whether petitioner is entitled to a charitable deduction for the Channing Ranch and, if so, the amount of such deduction. In deciding that issue, we must resolve other questions such as (1) the fair market value of the Channing Ranch to be included in decedent's gross estate for purposes of section 2031(a); [2] (2) whether an option to lease the surface rights of the Channing Ranch for grazing purposes, granted to Mrs. Hays for the duration of her life, diminishes the fair market value of the Channing Ranch, and, if so, the amount of *219 such diminution; and (3) whether such option causes the devise of the Channing Ranch to Texas Tech University (Texas Tech) to lapse under the terms of decedent's will. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated in our findings of fact by this reference. On May 28, 1988, decedent died testate a resident of Midland, Texas. At the time of his death, decedent was 92 years old. Decedent's wife, Hahl E. Proctor, predeceased decedent, having died testate on *220 December 5, 1971. Decedent and his late wife had no children. The independent executor of decedent's estate is the First National Bank of Amarillo. Decedent's will is being probated in the County Court, Midland County, Texas. At the time the petition was filed in the instant case, the First National Bank of Amarillo's principal place of business was located in Amarillo, Texas. 1. Background
During his lifetime, decedent operated two major ranching operations in Texas: the C Ranch [3] and the Channing Ranch. On the date of his death, decedent owned the surface rights in the Channing Ranch, a 60,570-acre tract of land located in Oldham and Hartley Counties, Texas. In addition, decedent also owned the mineral rights to the Channing Ranch. *221 The Channing Ranch was managed for decedent by intervenor Beth Hays and her late husband J.D. (Junior) Hays. Junior and Beth Hays began working for decedent at the Channing Ranch during 1953, and Junior Hays remained in decedent's employ until his untimely death on March 13, 1987. Mrs. Hays remained employed by decedent until his death in May 1988. Mrs. Hays still resides on the Channing Ranch. Junior and Beth Hays were more than mere employees to decedent. Decedent valued their judgment and their friendship and entrusted them to run his personal and business affairs. For example, both Junior and Beth were authorized signatories on decedent's bank accounts and were entrusted with paying the expenses incurred in operating and maintaining the Channing Ranch. Decedent also entrusted Junior Hays with the management of other financial assets valued between $ 3 and $ 4 million. During 1964, intervenor Clynice Baker began working for decedent as his secretary in Midland, Texas. Except for 2 years when she resided in Denver, Colorado, Ms. Baker worked continuously for decedent until his death on May 28, 1988. Ms. Baker also had authority to sign checks drawn on decedent's bank *222 accounts so that she could pay his personal and medical expenses as they came due. In addition to her secretarial duties, Ms. Baker also performed a number of personal services for decedent, such as driving him to and from doctors' offices and meetings with his friends and acquaintances. Ms. Baker also stayed with decedent when private duty nurses failed to arrive. On January 22, 1987, decedent granted Junior and Beth Hays, along with Clynice Baker, a joint medical power of attorney regarding decisions concerning his medical treatment and hospitalization. 2. Decedent's Inter Vivos Gifts
During his lifetime decedent made gifts to both Junior and Beth Hays and to Clynice Baker. During 1985, decedent made the following cash gifts: Value Of Gift [1] Gift  Clynice Baker
$ 1,010,000
$ 737,098
[2] Scott Baker 10,000 10,000
Junior Hays
500,000 366,278
Beth Hays
500,000 366,278
During 1986, decedent made the following cash gifts: [1] Value  Clynice Baker
$ 47,500
Junior Hays
28,750
Beth Hays
28,750
*223 During 1987, decedent made the following cash gifts: Value Of Gift [1] Gift  Clynice Baker
$ 1,000,000
$ 687,858
Beth Hays
1,000,000 687,858 Also during 1987, decedent gave Ms. Baker an automobile but required her to pay the applicable Federal gift tax. The net value of the gift of the automobile to Ms. Baker was $ 7,084. 3. Decedent's Pre-1986 Testamentary Planning
During his lifetime, decedent had several drafts of his last will and testament prepared, but only executed three of them. All of the wills decedent executed, including the will, the terms of which are in issue in the instant case, were drafted by Richard S. Brooks, an attorney who practiced in Midland, Texas. Mr. Brooks, who is now deceased, represented decedent and his late wife, Hahl E. Proctor, for many years in connection with their estate planning. On October 1, 1975, decedent executed a last will and testament in which he devised a one-half interest in the Channing Ranch to Junior and Beth Hays, as tenants in common. Decedent's remaining one-half interest in the Channing Ranch was devised to Melvin and Carol *224 Cotton, as tenants in common. During 1980, decedent requested Mr. Brooks to draft another last will and testament which provided Junior Hays with a life estate in the surface rights of the Channing Ranch, with the remainder interest therein to be transferred to the trust created under the will of decedent's late wife. [4] Decedent never executed the last will and testament drafted by Mr. Brooks during 1980. *225 On November 4, 1983, decedent executed a last will and testament which devised his interest in the Channing Ranch, along with all of the livestock and equipment owned by the Ranch, to Junior Hays for a term of years ending on the earlier of the date of Mr. Hays' death or upon Mr. Hays' attaining the age of 78. At the end of the term of years, the executor of decedent's estate was instructed to sell the Channing Ranch, along with the livestock and equipment thereon, and distribute one-half of the proceeds from the sale to Junior and Beth Hays, or to the survivor of them. The remaining proceeds were to be distributed to various other individuals. 4. Decedent's 1986 Will
On October 3, 1986, decedent executed the will which would become his final Last Will and Testament. [5] The will, in pertinent part, provides for the following bequests and devises of decedent's property: 3. J. D. HAYS (JUNIOR) AND WIFE BETH HAYS I give and bequeath to J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, all livestock, ranch equipment, ranch vehicles, and other personal property situated on or used in connection with the operation of my Channing Ranch, situated in Oldham *226 and Hartley Counties, Texas. This Section 3 hereof does not include any interest in real estate nor any interest in tangible property situated at, or used in connection with, my residential homestead in Midland, Midland County, Texas. 4. CLYNICE BAKER I give and devise to Clynice Baker my residential homestead situated in Midland, Midland County, Texas. This Section 4 hereof is restricted to real estate and is exclusive of tangible personal property situated at, or used in connection with, said residential homestead. 5. TEXAS TECH UNIVERSITY 5.1 SPECIAL DEVISE I give and devise to Texas Tech University, an instrumentality of the State of Texas, for exclusively public purposes, my Channing Ranch situated in Oldham and Hartley Counties, Texas, in fee simple, including, but not by way of exclusion, all improvements and fixtures thereon and all of my record interest in and to the oil, gas and other minerals in and under and that may be produced therefrom. 5.2 OPTIONAL GRAZING LEASE The special devise contained in Section 5.1 hereof shall be subject to a continuing option in favor of J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them to lease said *227 Channing Ranch for grazing purposes, for a term or terms not to exceed the duration of the life of the survivor of them, plus six months. Such lease shall be negotiated and renegotiated from time to time between J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, and Texas Tech University to provide for lease terms conforming to the fair market value of the use of said land for grazing purposes, and for such terms and restrictions as are appropriate to the maintenance and preservation of the market value of said land for grazing purposes. * * * It is the intent hereof that Texas Tech University shall receive, upon my death, the full fee title to said premises, and that the terms of the optional lease available to J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, shall be such as conform to the market value of the grazing use of the premises, and shall not operate to reduce the commercial value of the premises as a ranch property. 5.3 DEATH TAXES The special devise in favor of Texas Tech University contained in Section 5.1 hereof is made in the good faith, belief, and expectation that the value of the subject matter thereof will be deductible from *228 my gross estate for the determination of the United States estate tax liability of my estate, as provided in Section 2055(a)(1), Internal Revenue Code. Should it be finally determined by competent authority that the expected deduction is not allowed, whether under Section 2055(a)(1), or other provision of applicable law, the special devise made in this Section 5 hereof to Texas Tech University shall lapse. In such event, I give and devise the surface interest in and to my said Channing Ranch, exclusive of my record interest in and to the oil, gas and other minerals in and under and that may be produced therefrom, to J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, subject, however, to payment by the devisees of so much of the death taxes assessed upon my estate as may exceed the amount of death taxes which would have been assessed upon my estate had I not owned such surface interest in said Channing Ranch. This contingent devise of the surface interest in such Channing Ranch to J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, shall not entail personal liability of the devisees for such taxes, but shall constitute a lien upon the subject matter. *229 Should the devise to Texas Tech University given in this Section 5 hereof be defeated by the contingency contemplated in this Subsection 5.3 hereof, my record interest in and to the oil, gas and other minerals in and under and that may be produced from said land shall be a part of the residue of my estate to pass as provided in Subsection 6.1 hereof.
6. RESIDUE 6.1 INTANGIBLE PERSONALITY AND REALTY I give and bequeath the intangible personal property of my estate and the real estate thereof, not otherwise disposed of hereinabove, 2/3rds to J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, and 1/3rd to Clynice Baker.
* * * 7. DEBTS AND DEATH TAXES The debts of my estate and the death taxes lawfully assessed against my estate (except as contingently provided in Section 5.3 hereof) shall be borne ratably, first by the residue of my estate passing under Section 6.1 hereof, second by the residue of my estate passing under Section 6.2 hereof, and finally by the properties passing under Sections 3 and 4 hereof.
*230 In a letter dated September 29, 1986, to decedent by Mr. Brooks, the attorney who drafted the will, Mr. Brooks explains the provisions of the will governing the distribution of decedent's property. Mr. Brooks' letter addresses the reasons for the devise of decedent's interest in the Channing Ranch to Texas Tech and why a condition subsequent was included in the will that causes the devise of the Channing Ranch to Texas Tech to lapse. The letter, in pertinent part, states: I have prepared and submit herewith for your consideration a draft will. In doing so, I have been guided by our conference Thursday, September 25, and the list of properties and values which you presented to me on that occasion. In preparing this draft, I have been concerned and guided by three significant problems; namely: 1. The probability of contest of the will by your next of kin because of the fact that the general scheme which we discussed diverts the major value of your estate from the persons who would take in the event of intestacy. 2. The effect of death taxes based upon the preponderant value of real estate to consume the liquidity of the estate. 3. The difficulty of being certain *231 that a provision giving the Channing Ranch to charity following the provision of a right in favor of J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them to have the use thereof for life. * * * The principal device used in this draft and suggested in our conference to avoid the consumption of the liquidity of the estate by death taxes due to the preponderant value of real estate as compared with liquid assets, is the final disposition of the real estate to charity. Our discussion of that subject was very limited, both in respect of the identity of the charity and in respect of the charitable uses to be served. The feasibility of giving the use of property for life to a person or persons who are not exempt from federal income tax, and giving the property after such life use to a tax exempt entity, is very severely limited under Section 2055 Internal Revenue Code dealing with charitable deductions from gross estate for determination of estate tax liability. I quote herewith Subsection (e), Paragraphs (1) and (2) of Section 2055, Internal Revenue Code: "(e) Disallowance of Deductions in Certain Cases (1) No deduction shall be allowed under this section for a transfer *232 to or for the use of an organization or trust described in section 508(d) or 4948(c)(4) subject to the conditions specified in such sections. (2) Where an interest in property (other than an interest described in section 170(f)(3)(B)) passes or has passed from the decedent to a person, or for a use, described in subsection (a), and an interest (other than an interest which is extinguished upon the decedent's death) in the same property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to a person, or for a use, not described in subsection (a), no deduction shall be allowed under this section for the interest which passes or has passed to the person, or for the use, described in subsection (a) unless- (A) in the case of a remainder interest, such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5)), or (B) in the case of any other interest, such interest is in the form of a guaranteed annuity or is a fixed percentage distributed yearly of the fair market value of *233 the property (to be determined yearly)."
You will recognize the quoted material as the provision with which we had difficulty in the Hahl Proctor estate. I find it impracticable to conform a life interest in the Channing Ranch in favor of J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, with a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund, as briefly described in the above quotation, and more elaborately defined in sections 664 and 642(c)(5) Internal Revenue Code. The escape from this problem is found in the cross reference in the above quotation, "other than an interest described in section 170(f)(3)(B)". I quote herewith paragraph 3 of subsection 170(f) Internal Revenue Code: "(3) Denial of Deduction in Case of Certain Contributions of Partial Interests in Property. (A) In General. In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this *234 section if such interest had been transferred in trust. For purposes of this subparagraph, a contribution by a taxpayer of the right to use property shall be treated as a contribution of less than the taxpayer's entire interest in such property. (B) Exceptions. Subparagraph (sic) (A) shall not apply to- (i) a contribution of a remainder interest in a personal residence or farm. (ii) a contribution of an undivided portion of the taxpayer's entire interest in property, and (iii) a qualified conservation contribution."
The key word in the above quotation is the word "farm" in subparagraph (B)(i). You may well ask why provide that J. D. (Junior) Hays and wife, Beth Hays, must pay rent to Texas Tech University for a grazing lease on the Channing Ranch. I have two reasons; namely, (1) It enables me to pass the fee simple title to the Ranch to the University immediately upon your death, thus distinguishing it from a remainder interest, which is a title postponed to a title having prior enjoyment, and (2) It should make the value of the interest passing to the Universitysubstantially the full value of the Ranch at date of death. A remainder interest must *235 be valued by subtracting the value of the preceding life estate from the date of death value. The value of the life estate is determined by applying a factor found in life tables published in the Internal Revenue Regulations to the full value, as of the inception of the life interest. Valuation of the interest passing to charity in that manner would result in an increased burden on the liquid assets of the estate to pay death taxes. If the University is to receive immediate title, subject only to an option to J. D. (Junior) Hays and wife, Beth Hays, to lease the premises for the only purpose for which it is definitely suited at the market value of such a lease, it can hardly be supposed that the value to the University is substantially less than it would be in the absence of the option. I have provided for an alternate disposition of the Ranch in the event that competent authority should determine that its value is not deductible from gross estate for assessment of estate tax liability. The alternate disposition is to J. D. (Junior) Hays and wife, Beth Hays, in fee, excluding the mineral interest but subject to a lien to secure payment of the amount by which the death taxes *236 assessed exceed what would have been assessed had the gift to the University been treated as tax deductible. I recognize that this contingency (1) greatly increases the provision made for J. D. (Junior) Hays and wife, Beth Hays, (2) creates the necessity for their mortgaging the premises quite heavily to pay the death taxes to which the Ranch would be subjected, and (3) eliminates the plan of giving the Ranch to charity following the death of the survivor of J. D. (Junior) Hays and wife, Beth Hays. My original suggestion was that the Ranch be left to the First National Bank of Amarillo, trustee for charitable purposes, following the use thereof for life by J. D. (Junior) Hays and wife, Beth Hays. Upon further thought, I concluded that it would be desirable to substitute the University for the Bank, because (1) the University, as a State institution is, beyond question, an eligible taker under the Internal Revenue Code, falling directly within the prescription of section 2055(a)(1) "to or for the United States, any state, any political subdivision thereof, or the District of Columbia, for exclusively public purposes", (2) the University will be as near perpetual as any institution *237 which could be selected, and (3) the University is engaged in teaching and research among other fields in agriculture, geology, engineering, biology, and social sciences. Any of those fields, particularly agriculture and related fields such as animal husbandry and soil conservation could make beneficial use of the premises in research and teaching. Social sciences, directly or in collaboration with other institutions, might well find it feasible to use the Ranch in whole or in part for an institution such as your Boys' Ranch suggestion. A highly tentative calculation of probable estate tax serves to indicate that it is not feasible, without borrowing money on the Ranch, to provide $ 3,000,000.00 in value for each of the three principal beneficiaries. A tentative and rather abbreviated estimate indicates that there would be $ 2,615,000.00 in value, but not all in cash, available after eliminating the Ranch property and paying the death taxes. This assumes that the entire estate tax value would be allowed as a charitable contribution deduction. (Emphasis added.)
In a letter to Mr. Jack E. Little, senior vice president and trust officer of the First National Bank of Amarillo, *238 dated August 9, 1988, Mr. Brooks outlines the structure and the purposes of the provisions of decedent's will as follows: Though Section 5.2 of the will gives to Beth Hays a continuing option to lease the Channing Ranch for grazing purposes for a term or terms not to exceed the duration of her life plus six months, it contains restrictions intended to insure that the option will not be construed as repugnant to the fee given to Texas Tech University in Section 5.1, in either a legal or economic sense. * * * * * * Section 5.3 of the will subjects the gift to Texas Tech University appearing in Section 5.1 thereof to a condition subsequent which will defeat such gift, "should it be finally determined by competent authority that the expected deduction is not allowed, whether under Section 2055(a)(1) or other provision of applicable law"; that is, should it be so determined that the value of the gift to the University is not deductible from the value of Foy Proctor's gross estate for determination of federal estate tax liability of the estate. To insure that such adverse authoritative determination will not be made, the gift to the University is recited several times to *239 be of the fee simple title vesting upon the death of the testator as provided by Section 37, Texas Probate Code, and the option to lease given to Beth Hays is so restricted as to provide for a rental conforming to the fair market value of the premises for grazing purposes, and for a rental and other terms not impairing the market value of the premises for grazing purposes. In order to effectuate the intent of the testator, it is essential that the option not be construed as a gift of a life interest in land, and that the gift to the University not be construed as a remainder interest in land. * * * The structure of the will and its dominant intent is to avoid the creation of a charitable remainder trust. An additional argument that this result has been achieved may be made with reference to the exclusion of family farms in the statutory restriction upon the deductibility of the value of remainder interests in charitable remainder trusts. It is the clear intent of the will that no construction should be adopted relying solely upon the exclusion of family farms from the statutory restriction upon the deductibility of remainder interests in charitable trusts. The emphasis *240 of the will is upon avoiding the creation of a trust which is a charitable remainder trust in either an economic or a legal sense regardless of the application of the family farm provision. [Emphasis added.]
5. The Lease Agreement
Subsequent to decedent's death, Mrs. Hays exercised the option to lease the surface rights of the Channing Ranch. On December 19, 1988, Mrs. Hays, petitioner, and Texas Tech entered into a 3-year grazing lease agreement (the lease). On December 9, 1991, Mrs. Hays, petitioner, and Texas Tech extended the lease until December 31, 1994. Under the terms of the lease, Mrs. Hays rents the 60,569.56 acres of the Channing Ranch at $ 3.20 per acre. [6] Total payments through December 31, 1994, amount to $ 1,255,120.93. The lease restricts Mrs. Hays' use of the Channing Ranch to grazing cattle and requires her to maintain the future market value of the land for grazing purposes. In addition, Mrs. Hays is required to maintain adequate insurance for the property, along with worker's compensation coverage, and to pay all property taxes assessed on the land. The lease terms allow petitioner and Texas Tech to develop the mineral rights beneath the surface *241 of the Channing Ranch. Subsequent to decedent's death, the mineral rights beneath the Channing Ranch were developed and have produced a total of $ 63,293.95 in royalty income for petitioner and Texas Tech through the period ending April 30, 1993. 6. Miscellaneous
At the time of decedent's death, Mrs. Hays was 56 years of age and, based upon accepted actuarial tables, she had a life expectancy of 24.5 years. Petitioner reported a $ 6 million value for the Channing Ranch on its Federal estate tax return and claimed a corresponding $ 6 million charitable deduction for the value of interest in the Channing Ranch passing to Texas Tech. OPINION 1. Procedural Issues
Currently, no provision of the Rules of this Court *242 specifically permits intervention by third parties. Rule 1(a), however, provides, in pertinent part, that Where in any instance there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand.
Under rule 24(b) of the Federal Rules of Civil Procedure (rule 24(b)) a trial court has discretion to permit intervention by third parties. Rule 24(b) also permits the trial court to restrict the scope of intervention by third parties and to condition such intervention in any manner it believes is necessary for the efficient conduct of the proceedings. Wright et al., Federal Practice and Procedure: Civil 2d, secs. 1913, 1922 (1986 & Supp. 1993). Federal courts generally consider the following factors when deciding whether to grant a party's motion to intervene: (1) Whether the presence of a third party in the proceeding will prejudice the original parties; (2) whether allowing intervention by a third party will unduly delay the adjudication; (3) whether the moving party is or *243 may become a party to another proceeding in which the moving party's rights will be determined; or (4) whether there is some other adequate remedy available to the moving party. Wright et al., supra sec. 1913, at 379-388. Generally, once the court permits a third party to intervene in the proceeding, the intervenor is treated as an original party and has equal standing with the original parties, subject to any of the conditions the court may impose. See Ross v. Bernhard, 396 U.S. 531, 541 n.15 (1970). The Tax Court, like other Federal courts, may permit intervention by third parties in those unique situations where the ends of justice so require. See Commissioner v. Revere Land Co., 169 F.2d 469, 479 (3d Cir. 1948), revg. 7 T.C. 1061 (1946); Louisiana Naval Stores, Inc. v. Commissioner, 18 B.T.A. 533, 536 (1929); Estate of Duvall v. Commissioner, T.C. Memo. 1993-319; see also Sampson v. Commissioner, 710 F.2d 262 (6th Cir. 1983) (holding that the Tax Court has the power to permit, in its discretion, *244 intervention by persons or entities who have not been served with a statutory notice of deficiency). Although we have never definitively delineated the circumstances where intervention will be permitted, in Central Union Trust Co. v. Commissioner, 18 B.T.A. 300, 302-303 (1929), we stated that if the moving party has a stake in the outcome of the litigation before the Court which cannot be adequately protected by the parties currently before the Court, and permitting the intervention will lead to a more complete presentation of the legal issues to be decided, we are more inclined to grant the party's motion to intervene. Motions to intervene have been denied where the moving party fails to demonstrate to the Court that the party-petitioner was taking a position that was contrary to the moving party's interests in the litigation before the Court. See Sampson v. Commissioner, 81 T.C. 614 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987); Estate of Smith v. Commissioner, 77 T.C. 326 (1981); Estate of Siegel v. Commissioner, 67 T.C. 1033 (1977). *245 In the instant case, Texas Tech, Mrs. Hays, and Ms. Baker contend that intervention should be permitted for the following reasons: (1) Because, according to the terms of decedent's will, our decision regarding the deductibility and fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease affects whether the devise of the Channing Ranch to Texas Tech lapses, all three of the moving parties have a direct and immediate interest in the subject matter of this proceeding; (2) because petitioner has a fiduciary duty to deal impartially with all beneficiaries of decedent's estate, [7] petitioner is not able to adequately protect the interests of Texas Tech, Mrs. Hays, and Ms. Baker due to the fact that their respective interests in the subject matter of the instant case are adverse; (3) permitting intervention will not result in new issues of law or fact to be decided by the Court, and therefore, intervention will not unduly delay the adjudication; (4) permitting intervention will allow a more complete presentation of issues to be resolved in the instant case; and (5) petitioner has not objected to the parties' motions to intervene, but rather, has invited the parties *246 to intervene. We granted the motions to intervene of Texas Tech and Mrs. Hays and Ms. Baker. In so *247 doing, we limited the scope of intervention to (1) the issue of the fair market value of the Channing Ranch to be included in decedent's gross estate for purposes of section 2031(a), and (2) respondent's adjustment to the value of the charitable contribution deduction for the Channing Ranch claimed by petitioner on its Federal estate tax return. 2. Value of the Channing Ranch Included in Decedent's Gross Estate
Section 2031(a) provides that the value of the gross estate of a decedent is to be determined by including, to the extent provided in sections 2033 through 2046, the value at the time of his or her death of all property, real or personal, tangible or intangible, wherever situated. Section 2033 provides that the gross estate "shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." The value of the property to be included in the gross estate is the fair market value of the property at the moment of decedent's death. Sec. 20.2031-1(b), Estate Tax Regs. The fair market value of property is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither *248 being under any compulsion to buy or to sell and both having knowledge of relevant facts". Sec. 20.2031-1(b), Estate Tax Regs. In the instant case, decedent, on the date of his death, owned an undivided interest in the surface rights and the mineral rights of the Channing Ranch. In other words, decedent owned a fee simple interest in the Channing Ranch on the date of his death. Petitioner, respondent, Mrs. Hays, and Ms. Baker stipulated that on the date of decedent's death the fair market value of decedent's interest in the Channing Ranch, without regard to the impact of Mrs. Hays' lifetime lease option, was $ 6 million. [8]
Texas Tech, however, contends that the value of decedent's interest in the Channing Ranch on the date of his death was $ 4,890,312, [9] *251 which is the value that Texas Tech contends should be included in decedent's gross estate under section 2031(a). *249 Texas Tech contends that, for purposes of section 2031(a), the value of an asset included in decedent's gross estate is equal to the fair market value of the property interest passing at the moment of decedent's death. [10] Accordingly, Texas Tech contends that the property interest passing at the moment of decedent's death was his fee simple interest in the Channing Ranch subject to Mrs. Hays' lifetime lease option. [11]Texas Tech summarizes its position in following manner: The present tax controversy exists solely because Respondent claims that the value of the Channing Ranch which is includable in Testator's gross estate differs from the value which was passed to Texas Tech under the Will. Such a claim is defective because the federal estate tax is imposed on the property interest which passes at death. If the value of a decedent's property immediately before death "disappears" in whole or [in] part as of the instant of death, estate tax cannot be imposed on the disappearing value. To that extent, no property passes from the decedent to his beneficiaries. In this case, Testator devised the Channing Ranch, subject to a fair market value grazing lease option. This is *250 the property that passed at the instant of Testator's death. The fact that the Channing Ranch was unencumbered prior to his death is simply immaterial as that is not the property that passed at his death. Moreover, nothing of value passed to Ms. Hays as she was required to pay full fair market value rental throughout the term or terms of her lease. Therefore, the value that passed included only the encumbered value of the Channing Ranch and nothing else.
In short, Texas Tech claims that the fair market value of the Channing Ranch at the moment of decedent's death is equal to the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option. Accordingly, if we were to accept Texas Tech's position, the value of decedent's interest in the Channing Ranch to be included in his gross estate for purposes of section 2031(a) would be equal to the value of the deduction petitioner would be entitled to claim under section 2055. [12]
In support of its position, Texas Tech relies on Provident Natl. Bank v. United States, 581 F.2d 1081 (3d Cir. 1978). In Provident, the testator, prior to his death, owned a majority block of both the common stock and the class A stock of a closely held family corporation. The testator's will bequeathed a portion of the class A stock to a marital trust for the benefit of his surviving spouse. The testator's will, *252 however, provided that the class A stock transferred to the marital trust be exchanged for a new class of preferred stock pursuant to the terms of a recapitalization plan contained in the testator's will. The testator's remaining stock interest in the corporation was bequeathed under his will to a nonmarital trust and was not subject to the recapitalization plan. As a result of the recapitalization plan, the new class of preferred stock held by the marital trust was more valuable than the class A stock originally transferred to the marital trust. The Commissioner determined that both classes of stock were includable in the testator's gross estate at a uniform value of $ 157 per share. The Commissioner allowed a marital deduction for the class A stock bequeathed to the marital trust prior to the recapitalization plan at the $ 157 per share value. The executor of the testator's estate claimed that the stock held by the marital trust was worth more than $ 157 per share because the new class of preferred stock created pursuant to the recapitalization plan in the testator's will increased the value of the stock held by the marital trust. The testator's estate brought a refund suit *253 in Federal District Court, which sustained the Commissioner's determination. On appeal the Court of Appeals for the Third Circuit reversed the District Court and held that (1) the interest in the stock which the testator bequeathed to the marital trust included the increased value of the new class of preferred stock created pursuant to the recapitalization plan; and, (2) that the value of the stock included in the testator's gross estate under section 2031(a) was equal to the value of the stock for purposes of the marital deduction under section 2056. Texas Tech argues that, if the provision in the testator's will in Provident Natl. Bank v. United States, supra, increased the fair market value of the testator's interest in the stock for purposes of section 2031(a), then a provision in a will which decreases the fair market value of property should also decrease the value of property for purposes of section 2031(a). In the instant case, Texas Tech contends that the lifetime lease option granted to Mrs. Hays in decedent's will reduces the fair market value of the Channing Ranch, and consequently, the property to be included in decedent's gross estate *254 for purposes of section 2031(a) is the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option. Texas Tech also relies on Ahmanson Found. v. United States, 674 F.2d 761 (9th Cir. 1981), as support for its position. In Ahmanson, the testator, at the time of his death, owned, through a revocable trust, a controlling interest in the stock of HFA Co., as well as 99 nonvoting shares and 1 voting share of Ahmanco. The testator's will bequeathed his controlling stock interest in HFA Co. to Ahmanco and the 99 nonvoting shares in Ahmanco to a charitable foundation. The testator's will provided that the sole voting share of Ahmanco was to remain in the trust with the right to vote it vested in the testator's son. As in Provident Natl. Bank v. United States, supra, the Court of Appeals was faced with the issue, inter alia, of the proper value of the testator's interest in both the HFA Co. stock and the Ahmanco stock on the date of his death for purposes of sections 2031(a) and 2055. The court held that, for purposes of section 2031(a), the value of an asset must be determined at the moment of the testator's *255 death, and that such value must take into account any changes in value brought about by the testator's plan of distribution which would take effect prior to the distribution of assets to the various beneficiaries. The court held that the value of the Ahmanco stock included the testator's controlling stock interest in HFA Co. because Ahmanco acquired its interest in HFA Co. at the moment of the testator's death. The court in Ahmanson, however, rejected the argument that, for purposes of section 2031(a), the testator's stock interest in Ahmanco and HFA Co. should be revalued in order to reflect any change in value due to the testator's decision to divide his stock interest in HFA Co. and Ahmanco among the various beneficiaries of his will. In Ahmanson, the Court stated: We must distinguish, however, the effect of "predistribution" transformations and changes in value brought about by the testator's death, from changes in value resulting from the fact that under the decedent's estate plan the assets in the gross estate ultimately come to rest in the hands of different beneficiaries. The estate tax is a tax upon a transfer as the Foundation contends. However, it is a tax *256 on the privilege of passing on property, not a tax on the privilege of receiving property. "The tax is on the act of the testator not on the receipt of the property by the legatees." There is nothing in the statutes or in the case law that suggests that valuation of the gross estate should take into account that the assets will come to rest in several hands rather than one. [674 F.2d at 768; citations and quotation omitted; emphasis added.]
The court, however, held that for purposes of section 2055 a lesser value could be assigned to the 99 shares of nonvoting stock passing to the charity because those shares were less valuable. The court stated: The statute does not ordain equal valuation as between an item in the gross estate and the same item under the charitable deduction. Instead, it states that the value of the charitable deduction "shall not exceed the value of the transferred property required to be included in the gross estate." * * * * * * Thus, there are compelling considerations in conflict with the initially plausible suggestion that valuation for purposes of the gross estate must always be the same as valuation for purposes *257 of the charitable deduction. When the valuation would be different depending on whether an asset is held in conjunction with other assets, the gross estate must be computed considering the assets in the estate as a block. * * * The valuation of these same sorts of assets for the purpose of a charitable deduction, however, is subject to the principle that the testator may only be allowed a deduction for estate tax purposes for what is actually received by the charity -- a principle required by the purpose of the charitable deduction. * * * [674 F.2d at 772.]
Accordingly, the court concluded that a lower valuation for the nonvoting shares going to the charity was proper. Texas Tech also relies on United States v. Land, 303 F.2d 170 (5th Cir. 1962), as support for its disappearing value theory. In Land, a restrictive partnership agreement limited the value of a partnership interest to two-thirds of its calculated value if transferred during the partner's lifetime. At the partner's death, the restriction expired and the surviving partners could purchase the interest at its full value. The court held that the restrictions *258 did not control the estate tax value, and that the full value of the partnership interest was includable in the partner's gross estate. The court went on to observe that an option price also does not control the estate tax valuation in a situation where stock is held subject to an option that is to take effect at death, but the shareholder is left free to dispose of the stock during his life. This rule is based, however, on an entirely different foundation: when a decedent retains complete freedom to prevent the property being subjected to a restriction or contingency [by making an inter vivos transfer] his inaction constitutes a passive transfer of an interest in the property to the person who stands to benefit by the limitation on the value of the property passing to the decedent's heir or legatee. The rule applies the same principle that underlies Section 2038 and 2041, which include within a decedent's estate property over which he held a power of disposition or appointment. Under this analysis such a case does not present a problem of changing value; the interest is split and passes to different persons, but its total value is unaltered, and that is the value included *259 in the estate. [303 F.2d at 173-174; fn. refs. omitted; emphasis added.]
Finally, Texas Tech contends that our holding in Estate of Chenoweth v. Commissioner, 88 T.C. 1577 (1987), supports its theory of disappearing value. [13] In Estate of Chenoweth, the testator owned 100 percent of a closely held corporation at his death. For Federal estate tax purposes, the testator's estate reported the entire stock interest in the gross estate at a value that was accepted by the Commissioner. The testator's will bequeathed 51 percent of the stock to his spouse in a form that qualified for the marital deduction under section 2056. Because the surviving spouse's 51-percent block represented control, the stock was worth more than 51 percent of the value of the stock that had been included in the gross estate. *260 After discussing both Provident Natl. Bank v. United States, 581 F.2d 1081 (3d Cir. 1978), and Ahmanson Found. v. United States, 674 F.2d 761 (9th Cir. 1981), we held that in the case of an unrestricted transfer to the surviving spouse which consists of less than the testator's entire interest in the property, it is appropriate to value the interest passing to the surviving spouse as a separate interest in property rather than as an undivided portion of the taxpayer's entire interest. Estate of Chenoweth v. Commissioner, supra at 1590. As a result, the marital deduction was allowed for more than 51 percent of the value of the block of stock that was included in the gross estate. The issue of whether an asset must have the same value for purposes of both section 2031(a) and section 2056 was not before the Court. As to the reasoning of the courts of appeals in Provident and Ahmanson, we stated: B. As to the second closely interrelated point, the two cases diverge. In Provident, the court held that the values of decedent's assets must be computed in the same manner and *261 at the same values both for purposes of section 2031 and section 2056. In Ahmanson, on the contrary, the Court held that perfect symmetry was not required. * * * As to point B above, we think the reasoning of the Ahmanson court is more persuasive. While we would tend to agree that the sum of the parts cannot equal more than the whole -- that is, that the majority block together with the control premium, when added to the minority block of the company's stock with an appropriate discount for minority interest, should not equal more than the total 100-percent interest of the decedent, as reported for purposes of section 2031 -- it might well turn out that the sum of the parts can be less than the whole -- that is, that the control premium which is added to the majority block passing to decedent's surviving spouse might be less than the proper minority discount to be attributed to the shares passing to decedent's daughter, * * *. [88 T.C. at 1589-1590; fn. ref. omitted.]
As to whether a testator's decision to split his ownership interest among more than one beneficiary affects the value of the asset for purposes of section 2031(a), we stated: *262 Since the [estate] tax is laid upon the decedent's estate as a whole, and not upon the property which is received by the various legatees, the valuation of decedent's assets, at least for purposes of computing his gross taxable estate under section 2031, can usually be made without reference to the destination of those assets. [88 T.C. at 1582.]
Consequently, in Estate of Chenoweth, we held the value of an asset for purposes of section 2031(a) is not required to reflect the testator's decision to split his ownership interest in the asset between more than one beneficiary. In the instant case, Texas Tech contends that, as in Provident Natl. Bank v. United States, supra, Ahmanson Found. v. United States, supra, and United States v. Land, 303 F.2d 170 (5th Cir. 1962), a predistribution transformation of decedent's interest in the Channing Ranch occurred by reason of decedent's death. In short, Texas Tech contends that, because decedent devised his interest in the Channing Ranch subject to a lifetime lease option, the value of the property *263 interest to be included in his gross estate is the value of the Channing Ranch subject to the lifetime lease option. Texas Tech distinguishes the facts of the instant case from those situations where a decedent decides to split his ownership interest in an asset among the beneficiaries of his will. According to Texas Tech, Mrs. Hays received nothing of value under decedent's will because she was required, at all times, to pay a market rate of rent for the surface rights of the Channing Ranch. Accordingly, Texas Tech argues, decedent could not have split his ownership interest in the Channing Ranch between two beneficiaries because Mrs. Hays received nothing of value. Texas Tech argues that the result of the predistribution transformation of decedent's interest in the Channing Ranch brought about by his will was a diminution of the value of the Channing Ranch; i.e., value simply disappeared, which was not a result of decedent's decision to "split" his interest in the Channing Ranch between Texas Tech and Mrs. Hays because Texas Tech received decedent's fee simple interest in the Channing Ranch outright under the terms of decedent's will. Respondent, along with Mrs. Hays and Ms. *264 Baker, contends that any change in the value of the Channing Ranch results from decedent's will, which splits his fee simple interest in the Channing Ranch between Texas Tech and Mrs. Hays. Respondent contends that there is no predistribution transformation of decedent's ownership interest in the Channing Ranch at the moment of his death because decedent owned an unrestricted fee simple interest in the Channing Ranch at the moment of his death. As in United States v. Land, supra, respondent argues that decedent had complete freedom to prevent the property from being subject to a restriction during his lifetime, and therefore, the diminution of the fair market value of the Channing Ranch has not been caused by a predistribution transformation of decedent's ownership interest, but rather, is a consequence of his decision to split his interest in the Channing Ranch between Texas Tech and Mrs. Hays. Therefore, respondent argues that it is the fair market value of the Channing Ranch without regard to Mrs. Hays' lifetime lease option that should be included in decedent's gross estate. We conclude that, although Texas Tech is correct in contending that *265 the fair market value of a nontransferable right to rent property at its fair market value for the duration of the lease is not very significant, it is nonetheless an interest in property which has some value. Even Texas Tech's own expert pointed out that many long-term leases are purchased by owners of the underlying property and that Texas Tech might wish to purchase Mrs. Hays' option at some point in the future. Accordingly, we hold that Mrs. Hays' lifetime lease option has some monetary value and reject Texas Tech's argument that Mrs. Hays received nothing of value under decedent's will. At the moment of decedent's death, decedent owned an unencumbered fee simple interest in the Channing Ranch. Because neither decedent's death nor his will altered his ownership interest in the Channing Ranch, we conclude that the value of the Channing Ranch passing from decedent was not diminished. Unlike the plan of recapitalization in Provident Natl. Bank v. United States, 581 F.2d 1081 (3d Cir. 1978), or the transfer of the HFA Co. stock in Ahmanson Found. v. United States, 674 F.2d 761 (9th Cir. 1981), there was no predistribution *266 transformation of decedent's ownership interest in the Channing Ranch. Consequently, we hold that the value of decedent's unencumbered fee simple interest in the Channing Ranch was $ 6 million on the date of his death, which is the amount to be included in his gross estate for purposes of section 2031(a). 3. Value of the Channing Ranch Encumbered by Mrs. Hays' Optional Lifetime Grazing Lease
Section 5.2 of decedent's will granted Mrs. Hays an option to lease the surface rights of the Channing Ranch for grazing purposes during her life, plus 6 months. Section 5.2 also provides that if Mrs. Hays exercises her option to lease the surface rights of the Channing Ranch, she must, under a lease to be negotiated with Texas Tech, pay Texas Tech a market rate of rent. Section 5.2 further provides that the lease shall be renegotiated periodically so that the rent paid to Texas Tech will always reflect the fair market value of use of the surface rights of the Ranch. Finally, section 5.2 of the will requires that the lease contain terms requiring Mrs. Hays to maintain and preserve the surface rights of the Channing Ranch for grazing purposes. Section 2055(a) allows a deduction from *267 a decedent's gross estate for bequests and other transfers made to qualifying recipients for public, charitable, religious, and other similar purposes. Qualifying recipients are described in section 2055(a)(1) through (4). In the instant case, the parties and the intervenors have agreed that Texas Tech is a charitable organization described in section 2055(a). Furthermore, the parties and the intervenors have agreed that petitioner is entitled to a charitable deduction equal to the fair market value of the interest in the Channing Ranch passing to Texas Tech (reduced by any death taxes and administration expenses allocable to the interest passing to Texas Tech) in the event we decide that the devise of the Channing Ranch to Texas Tech does not lapse under the terms of section 5.3 of decedent's will. Consequently, the maximum charitable deduction allowable in the instant case, if any, is the value of the Channing Ranch less the value of Mrs. Hays' lifetime lease option. As is customary when an issue of valuation is before the Court, the parties and intervenors have relied extensively on experts to support their respective views on the fair market value of the Channing Ranch subject *268 to Mrs. Hays' lifetime lease option. Before turning to an analysis of the divergent expert opinions in the instant case, we note that we evaluate expert opinion evidence in light of both the qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by the opinions of expert witnesses. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Instead, we may reach a decision on value based on our own analysis of all the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Hamm v. Commissioner, 325 F.2d 934, 940-941 (8th Cir. 1963), affg. T.C. Memo. 1961-347; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991). *269 Although we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any part of such opinion. Rutter v. Commissioner, 853 F.2d 1267, 1275 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Parker v. Commissioner, supra at 562-565. Moreover, even if we accept the general methodology of an expert witness, we may reject that expert's ultimate conclusion if the record does not support that conclusion. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1331 (5th Cir. 1987), affg. T.C. Memo. 1985-267 (a court may arrive "at its ultimate conclusion based on commonsense rather than lemminglike reliance upon the testimony of the experts"). Intervenor Texas Tech's Expert Report
Texas Tech originally claimed that the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option was $ 5,250,000. In support of its contention, Texas Tech offered the report and testimony of its expert, J.B. *270 Featherston, who is a qualified expert in the area of real estate appraisal. Mr. Featherston calculated that the net cash-flow from the current lease is $ 155,564. [14] Mr. Featherston estimated that the value of the lease payments will increase at an annual rate of 4 percent for a period of 19 years. [15] *271 He then applied a discount rate of 5 percent to calculate the present value of the net cash-flow of the rental payments. [16] Mr. Featherston concluded that income from lease interest had a present value of $ 1,880,041. Mr. Featherston next calculated the present value of the reversionary interest in the Channing Ranch. Mr. Featherston used the $ 6 million stipulated present value of the Channing Ranch as the starting point of his analysis. Using an Index of Land Values for the State of Texas compiled by the U.S. Department of Agriculture, Mr. Featherston estimated that the real estate which comprises the Channing Ranch would appreciate at a rate of 4.5 percent per year over the next 19 years. Consequently, at the end of the 19-year lease period, the Channing Ranch would be worth approximately $ 13,847,162. Using a discount rate of 9 percent, Mr. Featherston concluded that the present value of the reversionary interest in the Channing Ranch is $ 2,693,130. The present value of the net cash-flow of the rental income generated by the lease plus the present value of the reversionary interest in the Channing Ranch equals $ 4,573,171. Mr. Featherston next concluded that there are certain "noncash benefits" *272 which the owner of Channing Ranch would possess. These noncash benefits include $ 121,140 for recreational rights, [17] $ 454,275 for the rights to the minerals found beneath the surface of the Channing Ranch, [18] and $ 118,112 for certain intangible properties, such as the pride in owning a big cattle ranch located on the Texas panhandle. The total value of the noncash benefits is $ 693,527. Mr. Featherston added the $ 693,527 value of the noncash benefits to the present values of the net cash-flow from the lease and the reversionary interest and concluded that the fair market value of the interest in the Channing Ranch passing to Texas Tech, if any, is approximately $ 5,250,000. Accordingly, as calculated by Mr. Featherston, the "net implied penalty" caused by Mrs. Hays' lifetime lease option is $ 750,000 or 12.5 percent of $ 6 million. *273 Respondent, along with Mrs. Hays and Ms. Baker, contends that Mr. Featherston engaged in double counting when he included the value of the "noncash items". Texas Tech admits that Mr. Featherston engaged in double counting, but only "with respect to a double counting of the remainder interest in such tangible and intangible rights." Texas Tech's revised estimate of the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option is $ 4,890,312. [19] The revised estimate is calculated in the following manner: to the $ 1,880,041 net present value of the income from the Mrs. Hays' lease as originally calculated by Mr. Featherston, he adds $ 121,140 for recreational rights and $ 454,275 for mineral rights. [20] Consequently, the combined total value of the net cash-flow produced by Mrs. Hays' lease and the recreational and mineral rights is $ 2,455,456. *274 Next, Texas Tech calculates the value of the reversionary interest in the Channing Ranch beginning with $ 5,424,585 ($ 6 million stipulated value of the Channing Ranch less $ 575,415 for recreational and mineral rights) as the present value of the Channing Ranch. Texas Tech subtracts the noncash benefits from the $ 6 million stipulated value of the Channing Ranch to eliminate the double counting found in Mr. Featherston's initial report. Texas Tech projects that the value of the Channing Ranch at the end of the 19-year lease term, assuming an annual appreciation rate of 4.5 percent, is $ 12,519,184. Texas Tech then discounts the $ 12,519,184 to present value using a 9-percent discount rate. Consequently, Texas Tech concludes that the present value of the reversionary interest in the Channing Ranch is $ 2,434,856. On the basis of the foregoing calculations, Texas Tech contends that the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option is $ 4,890,312 ($ 2,434,856 + $ 2,455,456). The "net implied penalty" due to Mrs. Hays' lifetime lease option is $ 1,109,688 or 18 percent of the $ 6 million stipulated value of the Channing Ranch. Respondent, along with *275 Mrs. Hays and Ms. Baker, also objects to Mr. Featherston's report on the ground that Mr. Featherston has no reliable basis for reducing the projected term of Mrs. Hays' lifetime lease option from 25 years to 19 years. The 25-year period is based on the stipulated life expectancy of Mrs. Hays plus 6 months. Mr. Featherston, on the basis of his general experience with long-term leases, contends that, because most long-term leases are bought out by the owners of the underlying property, Texas Tech may, at some point in the future, find it desirable to purchase Mrs. Hays' lifetime lease option. [21] Mr. Featherston also contends that his use of a 19-year period is reasonable because of the many risks in running a profitable ranching operation. Mr. Featherston concludes that it is more likely that Mrs. Hays will decide not to exercise her option to lease the Ranch if the ranching operation is not profitable. *276 While Mr. Featherston's rationale for the 19-year period is plausible, we note that all the other experts who testified in the instant case used Mrs. Hays' stipulated life expectancy in reaching their respective estimates of the present value of the income stream produced by Mrs. Hays' lease and the reversionary interest in the Channing Ranch at the end of the lease period. We are not persuaded that Mr. Featherston's experience with long-term leases is any more reliable than the actuarially determined life expectancy of Mrs. Hays, especially in light of the lack of independent evidence or objective criteria in support of his assumption. Rose v. Commissioner, 88 T.C. 386, 418 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Parker v. Commissioner, 86 T.C. at 564. Accordingly, we accept the 25-year period as the most accurate estimate of the period of time which Mrs. Hays will exercise the lease option. Respondent's Expert Report
Respondent contends that the value of the Channing Ranch encumbered by Mrs. Hays' lifetime lease option is $ 4,414,000. Respondent offers the report and testimony *277 of Armand Smith, who is recognized by the parties as a qualified expert in the area of real estate appraisal. Mr. Smith calculated the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option by averaging the results of two different methods of valuation -- the "investment differential" method and the "conventional lease analysis" method. [22] Under the investment differential method, Mr. Smith began with the $ 6 million ($ 99.06/acre) stipulated value of the Channing Ranch on the date of decedent's death. Under the terms of the lease that Mrs. Hays negotiated with Texas Tech, Mrs. Hays agreed to pay Texas Tech $ 3.20 per acre or a total of $ 193,882.62 per year for the use of the Channing Ranch for grazing purposes. Mr. Smith estimated that Texas Tech would earn a 3-percent return on the value of the lease. Because decedent's will required that the lease be periodically renegotiated to reflect the fair market value of the Ranch for grazing purposes, Mr. Smith estimated that rental rate of the lease will increase 6 percent every 5 years over the projected 25-year lease term. Accordingly, at the end of the 25-year period, Mrs. Hays' annual rental payments for the *278 use of the Channing Ranch will total $ 5,484,574. Mr. Smith then discounted the $ 5,484,574 to present value using a 3-percent discount rate and concluded that the present value of the lease income is $ 3,753,320. Mr. Smith assumed that no rational person would invest $ 6 million for a return of only 3 percent because comparable investments were yielding an average of 11 percent. Accordingly, Mr. Smith discounted the $ 5,484,574 value of the lease payments to present value using an 11-percent discount rate. Mr. Smith calculated that the present value of lease payments using an 11-percent discount rate is $ 1,744,840. Mr. Smith next concluded that the loss in value to the owner of the Channing Ranch due to Mrs. Hays' lifetime option is $ 2,008,480. Mr. Smith arrived at that figure by subtracting the value of the lease payments discounted to present value using a 3-percent discount rate ($ 3,753,320) from the value of the lease payments discounted to present *279 value using an 11-percent discount rate ($ 1,744,840). Using the investment differential method of valuation, Mr. Smith found that the value of the Channing Ranch encumbered by Mrs. Hays' lifetime lease option is $ 3,991,520 ($ 6 million - $ 2,008,480). Mr. Smith also considered the value of the Channing Ranch using the "conventional lease analysis" method in which the income stream from the lease is discounted to present value and added to the present value of the reversionary interest in the property. On the basis of a chart contained in the U.S. Department of Agriculture's Index of Land Values, Mr. Smith calculated that ranch land used for grazing cattle had increased in value at an average rate of 5.84 percent per year during the 25 years prior to decedent's death. Mr. Smith predicted that if the same market trend for ranch land continued during the next 25 years (the estimated length of Mrs. Hays' lease option), the value of the Channing Ranch would increase by 146 percent and it would be worth approximately $ 14,718,000 at the end of Mrs. Hays' projected lease option. Mr. Smith reduced the $ 14,718,000 estimated future value of the Channing Ranch to present value using *280 an 11-percent discount rate and concluded that the present value of the reversionary interest in the Channing Ranch is approximately $ 1,083,000. Mr. Smith then added the $ 1,083,000 present value of the reversion in the Channing Ranch to the $ 3,753,320 discounted value (at 3 percent) of the income stream produced by the lease. Accordingly, using the "conventional lease analysis", Mr. Smith valued the Channing Ranch subject to Mrs. Hays' lifetime lease option at $ 4,836,320, which Mr. Smith then rounded to $ 4,836,000. Mr. Smith averaged the two values he calculated for the Channing Ranch using the "investment differential" method and the "conventional lease analysis" method, and concluded that the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option was $ 4,414,000, a "net implied penalty" of 26 percent due to Mrs. Hays' lifetime lease option. Texas Tech criticizes Mr. Smith's report because he assumed that the duration of Mrs. Hays' lease would be equal to her stipulated life expectancy. As we stated above, we find that the 25-year period is the most accurate estimate of the length of time that Mrs. Hays will exercise her option to lease the Channing Ranch. *281 Texas Tech also criticizes Mr. Smith's report because he failed to take into account other valuable "noncash" rights, such as recreational and mineral rights, that Texas Tech could exploit during the period the Channing Ranch is subject to Mrs. Hays' lifetime lease option. Intervenors Hays' and Baker's Expert Reports
Mrs. Hays and Ms. Baker offered the testimony and reports of two experts, Mr. James F. Hayes and Mr. Wayne Austin, who valued the Channing Ranch subject to Mrs. Hays' lifetime lease option at $ 2,150,000 and $ 4,500,000, respectively. We will analyze the testimony and reports of Mr. Hayes and Mr. Austin separately. Both Mr. Hayes and Mr. Austin are recognized by the parties as qualified experts in the area of real estate appraisal. Mr. Hayes used the "conventional lease analysis" method of valuation that both respondent's and Texas Tech's experts utilized in valuing the Channing Ranch subject to Mrs. Hays' lifetime lease option. In order to estimate the present value of the income stream produced by the lease, Mr. Hayes assumed that the value of the rental payments would increase at an annual rate of 5.7 percent for the next 25 years, the time period Mrs. Hays *282 is expected to exercise her lease option. [23] The 5.7-percent annual growth rate is based upon the average annual growth rate for grazing leases during the 25-year period prior to decedent's death. Mr. Hayes assumed that gross rents for the surface rights of the Channing Ranch will rise from the current rate of $ 3.20 per acre to $ 9.70 per acre at the end of the 25-year period. Using a 14-percent discount rate, Mr. Hayes discounted the sum of the gross rental payments to present value. [24] Mr. Hayes calculated that the present value of the income stream produced by the lease is approximately $ 1,574,794. *283 Next, Mr. Hayes calculated the present value of the reversionary interest in the Channing Ranch. Mr. Hayes estimated that the value of the real estate which comprises the Channing Ranch will appreciate at an annual rate of 3.73 percent. At the end of the 25-year period during which Mrs. Hays is expected to exercise her option to lease, the land will be worth $ 250 per acre. Mr. Hayes then discounted the $ 250 per acre future value of the land to present value using a 14-percent discount rate. Mr. Hayes calculated the present value of the reversion to be approximately $ 572,377 or $ 9.45 per acre. Mr. Hayes added the present value of the income stream produced by the lease ($ 1,574,794) to the present value of the reversionary interest in the land ($ 572,377) and concluded that the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option is worth approximately $ 2,150,000. Thus, the "net implied penalty" due to Mrs. Hays' lifetime lease option is 61.5 percent. Texas Tech criticizes Mr. Hayes' report on the ground that he did not take into account the value of noncash benefits, such as recreational and mineral rights, that Texas Tech could exploit while the ranch *284 is subject to Mrs. Hays' lifetime lease option. Additionally, Texas Tech criticizes the 14-percent discount rate used by Mr. Hayes to calculate the net present value of both the income stream produced by Mrs. Hays' lease and the reversionary interest in the Channing Ranch. Texas Tech contends that the Treasury Department's 30-year bond had a yield of approximately 9 percent at the time of decedent's death and Triple A corporate bonds were yielding between 10 and 11 percent and that only junk bonds had yields approaching 14 percent. Texas Tech contends that an investment in ranch property, even property subject to a long-term lease, is not as risky as investing in junk bonds, and therefore, the 14-percent rate of return does not reflect the rate of return most investors in ranch properties expected to earn. Moreover, Texas Tech points to the fact that Mr. Hayes chose the 14-percent discount rate on the basis of a single transaction, which Texas Tech contends was not representative of the market. In short, Texas Tech contends that Mr. Hayes has not adequately supported his use of a 14-percent discount rate. We agree with Texas Tech's contention that Mr. Hayes has not provided *285 adequate support for his use of a 14-percent discount rate. We are not convinced that most ranchers expect a 14-percent return on their investment. Even Mr. Hayes conceded at trial that most ranchers, as opposed to investors, expected a return on their investment in the range of 5 to 6 percent. Mrs. Hays and Ms. Baker also presented the testimony and report of Mr. Wayne Austin. Mr. Austin estimates that the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option is $ 4,500,000, which represents a 25-percent discount from the $ 6 million stipulated value of the Channing Ranch. Mr. Austin reached his conclusion by surveying the opinions of various persons with experience in the buying and selling of ranches. Mr. Austin familiarized such persons with facts of the instant case and inquired of them what they believed a potential purchaser would be willing to pay for a ranch, similar to the Channing Ranch, encumbered by a 25-year lease that required the lessee to pay a market rate rent. Mr. Austin also utilized data he gleaned from the records of several sales of ranch properties he deemed "comparable" to a sale of the Channing Ranch subject to Mrs. Hays' *286 lifetime lease option. Based upon his survey of the opinions of real estate professionals and his analysis of the comparable sales data, Mr. Austin concludes that, due to Mrs. Hays' lifetime lease option, the Channing Ranch would sell on the market at a 25-percent discount from the value of Channing Ranch unencumbered by Mrs. Hays' lifetime lease option. Texas Tech criticizes Mr. Austin's report on the grounds that his analysis does not rely on objective criteria and that the sales of the ranch properties he analyzed would not be comparable to a sale of the Channing Ranch subject to Mrs. Hays' lifetime lease option. Texas Tech contends that Mr. Austin's report does not provide an adequate basis for the Court to determine whether the persons Mr. Austin contacted are qualified to give an expert opinion as to the value of the Channing Ranch subject to Mrs. Hays' lifetime lease option. Texas Tech argues that an expert report that merely surveys lay opinion should not be given the same weight as an expert report that utilizes objective criteria or relies on the opinions of other qualified experts. We agree. Consequently, we are not persuaded by the opinions of the individuals surveyed *287 by Mr. Austin. We also agree with Texas Tech's contention that sales of ranch properties that Mr. Austin analyzed would not be comparable to a sale of the Channing Ranch subject to Mrs. Hays' lifetime lease option. The sales Mr. Austin analyzed involved properties that were located in different areas of Texas and were encumbered by different types of leases. [25]
*288 Fair Market Value of the Channing Ranch Subject to Mrs. Hays' Lifetime Lease Option
We hold that the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option is $ 4,836,320, which is the value respondent's expert, Mr. Smith, calculated using the "conventional lease analysis" method of valuation. We reject the conclusion of respondent's expert that an average of the values that he calculated for the Channing Ranch, using the "investment differential" method and the "conventional lease analysis" method, is a proper method of valuation. The "investment differential" method of valuation is frequently used by appraisers to compare one potential investment to the whole spectrum of other investment opportunities available to a client. The "investment differential" method attempts to measure "investment value" rather than market value. Investment value is more subjective because it is predicated on the investment preferences of the individual investor. [26] Appraisal Institute, The Appraisal of Real Estate 413 (10th ed. 1992). The "conventional lease analysis" method of valuation attempts to measure the market value of an investment without necessarily *289 measuring the investment value of the asset. [27]Id.
Consequently, we believe that the "conventional lease analysis" method of valuation is the best method to measure the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option. [28]
*290 We reject Texas Tech's revised estimate for several reasons. First, Mr. Featherston's estimate that Mrs. Hays would exercise her option to lease the Channing Ranch for only 19 years, as we stated above, is not grounded in objective criteria. Second, there is insufficient evidence in the record to enable us to conclude that the value Mr. Featherston assigned to the recreational rights reflects the market value of recreational rights for ranches located on the Texas panhandle. Further, we are not convinced that the value Mr. Featherston assigned to the minerals located beneath the Channing Ranch reflects the market value of such rights. In his report, Mr. Featherston concluded that at the time of decedent's death, the royalty income from the rights to the minerals beneath the Channing Ranch was "not capable of independent valuation". Mr. Featherston concluded, again on the basis of his experience, that decedent's interest in the minerals beneath the Channing Ranch "was responsible for approximately $ 7.50 per acre of value" of decedent's undivided fee simple interest. We find Mr. Featherston's appraisal of the mineral rights to be speculative in nature, and not grounded in objective *291 criteria. Rose v. Commissioner, 88 T.C. at 418; Parker v. Commissioner, 86 T.C. at 564. Finally, the discount rate Mr. Featherston selected does not accurately reflect the level of risk involved in owning ranch property. Mr. Featherston used a 9-percent discount rate, a rate of return which approximates the yield of 30-year Treasury bonds at the time of decedent's death. Treasury bonds are regarded by investors as essentially risk-free investments because they are backed by the full faith and credit of the U.S. Government. Owning real estate is considered a conservative investment in most instances, but such an investment is far from risk free. We believe that the 11-percent discount rate used by respondent's expert is a better reflection of risks associated with investing in ranch property, and is a more accurate estimate of the rate of return investors expect to earn when investing in ranch property. With regard to the expert reports provided by Mrs. Hays and Ms. Baker, we reject them for the reasons stated above. Based on the foregoing, we hold that the fair market value of the Channing Ranch subject to Mrs. *292 Hays' lifetime lease option is $ 4,836,320. Accordingly, the "net implied penalty" due to Mrs. Hays' lifetime lease option is slightly less than 20 percent [($ 6,000,000 - $ 4,836,320) / $ 6,000,000]. 4. Meaning of the Phrase "Expected Deduction" in Decedent's Will
For Federal estate tax purposes, we look to State law in order to determine what property rights are created, if any, under the terms of a decedent's will. Morgan v. Commissioner, 309 U.S. 78 (1940); Lang v. Commissioner, 304 U.S. 264 (1938). Consequently, the principles of will construction under State law are used to resolve any ambiguities contained in a decedent's will. See Riggs v. Del Drago, 317 U.S. 95 (1942); Estate of Horne v. Commissioner, 91 T.C. 100 (1988); Estate of Fine v. Commissioner, 90 T.C. 1068 (1988), affd. without published opinion 885 F.2d 879 (11th Cir. 1989); Estate of Reid v. Commissioner, 90 T.C. 304 (1988). In the instant case, decedent's domicile on the date of his death *293 was the State of Texas, and the Channing Ranch is situated in the State of Texas; consequently, the laws of the State of Texas govern the construction and interpretation of decedent's will. Texas law provides that the primary objective in interpreting a will is to give effect to the testator's intent. Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, 748 S.W.2d 218, 220 (Tex. 1988); Powers v. First Natl. Bank, 161 S.W.2d 273, 281 (Tex. 1942). We first look to the language of the testamentary instrument in order to ascertain the testator's intent. Shriner's Hosp. for Crippled Children v. Stahl, 610 S.W.2d 147, 151 (Tex. 1980). If the will contains language that is ambiguous, a court may consider extrinsic evidence to assist it in determining the meaning of a particular term. Guilliams v. Koonsman, 279 S.W.2d 579, 581 (Tex. 1955); see also Fort Worth Natl. Bank v. United States, 396 F. Supp. 337, 341 (N.D. Tex. 1975), affd. 552 F.2d 158 (5th Cir. 1977). The language of a will is considered *294 to be ambiguous when the words used by the testator are capable of more than one meaning. El Paso Natl. Bank v. Shriners Hosp. for Crippled Children, 615 S.W.2d 184, 185 (Tex. 1981). Even if a will contains ambiguous terms, however, the intent of the testator still controls the construction of the will. Haile v. Holtzclaw, 414 S.W.2d 916, 922 (Tex. 1967). In Stewart v. Selder, 473 S.W.2d 3, 7 (Tex. 1971), the Texas Supreme Court stated: A will is a unilateral instrument, and the court is concerned only with the intention of the testator as expressed in the document. The sense in which the words were used by the testator is the ultimate criterion, and the court may always receive and consider evidence concerning the situation of the testator, the circumstances existing when the will was executed, and other material facts that will enable the court to place itself in the testator's position at the time. Extrinsic evidence of that nature is received, of course, to assist the court in determining the sense in which the words were used by the testator. The general principle that admits *295 the evidence for that purpose is subject to at least one exception. The intention of the testator must be found, in the last analysis, in words of the will, and for that reason his other declarations of intention dealing with the subject of the specific document are generally not admissible. * * * [Citations omitted.]
Accordingly, under Texas law, we look to the four corners of the will in order to determine decedent's overall intention and, if the will contains ambiguous language, we may rely on extrinsic evidence in order to determine the context in which decedent used such language. In the instant case, section 5.1 of decedent's will devised decedent's fee simple interest in the Channing Ranch to Texas Tech. Section 5.2 of decedent's will states that the "special devise" of the Channing Ranch to Texas Tech contained in section 5.1 is subject to a continuing option in favor of Mr. and Mrs. Hays, or the survivor of them, to lease the Channing Ranch for grazing purposes for a term or terms not to exceed the duration of the life of the survivor of them, plus 6 months. Section 5.3 of decedent's will, however, provides the following: The special devise in favor of Texas *296 Tech University contained in Section 5.1 hereof is made in the good faith, belief, and expectation that the value of the subject matter thereof will be deductible from my gross estate for the determination of the United States estate tax liability of my estate, as provided in Section 2055(a)(1), Internal Revenue Code. Should it be finally determined by competent authority that the expected deduction is not allowed, whether under Section 2055(a)(1), or other provision of applicable law, the special devise made in this Section 5 hereof to Texas Tech University shall lapse. * * * [Emphasis added.]
The phrase "expected deduction" is not defined in the will. Texas Tech contends that decedent's primary intent was to make a testamentary gift to Texas Tech that would qualify for a deduction under section 2055(a). Texas Tech contends that section 5.3 of decedent's will expresses his intention that the special devise of the Channing Ranch to Texas Tech lapses only in the event we decide that his estate is not entitled to a charitable deduction equal to the fair market value of the interest in the Channing Ranch passing to Texas Tech under section 5 of his will. Alternatively, *297 Texas Tech argues that, in the event the Court decides that the phrase "expected deduction" is ambiguous, the extrinsic evidence contained in the record clearly shows that decedent intended that the special devise of the Channing Ranch to Texas Tech would lapse only in the event we decide decedent's estate is not entitled to a charitable deduction, under section 2055(a), substantially equal to the fair market value of the Channing Ranch on the date of decedent's death. Texas Tech, on the basis of its expert's opinion regarding the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option, contends that decedent's estate is entitled to a charitable deduction under section 2055(a) that is substantially equal to the fair market value of the Channing Ranch on decedent's date of death. Texas Tech argues that the condition subsequent contained in section 5.3 has not been met, and therefore, the special devise of the Channing Ranch to Texas Tech does not lapse. Respondent, along with Mrs. Hays and Ms. Baker, argues that decedent's use of the phrase "expected deduction", when read in the context of the will as a whole, shows that he intended the special devise *298 of the Channing Ranch to Texas Tech to lapse in the event his estate is not entitled to a deduction, under section 2055(a), equal to the fair market value of the Channing Ranch on the date of his death. In support of their argument, they point first to the language of section 5.2 of decedent's will, which states that the terms of Mrs. Hays' lease "shall not operate to reduce the commercial value of the premises as a ranch property". Respondent, along with Mrs. Hays and Ms. Baker, contends that all of the experts who testified in the instant case stated that Mrs. Hays' lifetime lease option impairs the fair market value of the Channing Ranch. Accordingly, they argue that petitioner is not entitled to the charitable deduction decedent "expected", and therefore, the devise of the Channing Ranch to Texas Tech lapses. Additionally, respondent, along with Mrs. Hays and Ms. Baker, argues that, because the first sentence of section 5.3 refers to "the special devise to Texas Tech University contained in Section 5.1", the phrase "expected deduction", used in the second sentence of section 5.3, must refer to the fair market value of the devise contained in section 5.1 of decedent's will; *299 i.e., the fair market value of the Channing Ranch on the date of decedent's death. Respondent, along with Mrs. Hays and Ms. Baker, contends that, because all of the experts who testified in the instant case agree that petitioner is not entitled to a charitable deduction under section 2055(a) equal to the fair market value of the Channing Ranch on the date of decedent's death, the special devise to Texas Tech lapses. Alternatively, respondent, along with Mrs. Hays and Ms. Baker, argues that if the Court decides that the phrase "expected deduction" is ambiguous, the extrinsic evidence contained in the record clearly shows that decedent intended the special devise of the Channing Ranch to lapse in the event we decide that his estate is not entitled to a charitable deduction, under section 2055(a), substantially equal to the fair market value of the Channing Ranch on the date of his death. Relying on the reports and testimony of their respective experts, respondent, and Mrs. Hays and Ms. Baker, contend that the charitable deduction which petitioner is entitled to claim under section 2055(a) is not substantially equal to the fair market value of the Channing Ranch on the date of decedent's *300 death. We find the phrase "expected deduction" in section 5.3 of decedent's will to be ambiguous. Each of the parties has presented plausible readings of the phrase based upon the language found in other sections of decedent's will. We reject respondent's, and Mrs. Hays' and Ms. Baker's, argument that the sentence in section 5.2 which states that Mrs. Hays' lease "shall not operate to reduce the commercial value of the premises as a ranch property" is dispositive of the question of the amount of the deduction decedent expected his estate would be entitled to claim under section 2055(a). The full sentence upon which respondent, Mrs. Hays, and Ms. Baker, rely reads as follows: It is the intent hereof that Texas Tech University shall receive, upon my death, the full fee title to said premises, and that the terms of the optional lease available to J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, shall be such as to conform to the market value of the grazing use of the premises, and shall not operate to reduce the commercial value of the premises as a ranch property. [Emphasis added.]
We find that the phrase "shall not operate to reduce the commercial *301 value of the premises as a ranch property", when read in the context of the sentence as a whole, is merely a reiteration by decedent of his intention that Mrs. Hays pay a market rent for the surface rights of the Channing Ranch and that she be required to maintain and preserve the market value of the Ranch for grazing purposes, just as decedent's statement in section 5.2 that Texas Tech shall "receive full fee title" to the Channing Ranch is merely a reiteration of the terms of section 5.1. Similarly, we reject respondent's, and Mrs. Hays' and Ms. Baker's, contention that the phrase "expected deduction" contained in section 5.3 of decedent's will can only be interpreted as decedent's expression of his desire that the devise of the Channing Ranch to Texas Tech lapse in the event we decide that his estate was not entitled to a charitable deduction under section 2055(a) equal to the full fair market value of the Channing Ranch on the date of his death. Respondent's, and Mrs. Hays' and Ms. Baker's, contention is based on the fact that decedent, in the first sentence of section 5.3, referred to the value of the devise contained in section 5.1 of his will, which, they argue, shows that *302 decedent expected that his estate would be entitled to a charitable deduction equal to the full fair market value of the Channing Ranch on the date of his death. The phrase "expected deduction", however, is used in a sentence which states that if it should be "finally determined by competent authority that the expected deduction is not allowed under Section 2055(a)(1), * * *, the special devise made in this Section 5 hereof to Texas Tech University shall lapse". (Emphasis added.) Section 5 of decedent's will, when read as a whole, devises decedent's fee simple interest in the Channing Ranch to Texas Tech subject to Mrs. Hays' lifetime lease option. Consequently, it is equally plausible that the deduction which decedent "expected" under section 2055(a)(1) is a deduction equal to the value of the Channing Ranch passing to Texas Tech; i.e., equal to the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option. Because decedent's will contains ambiguous terms, we may, under Texas law, look to the extrinsic evidence for guidance in interpreting the phrase "expected deduction". Stewart v. Selder, 473 S.W.2d 3, 7 (Tex. 1971). *303 Under Texas law, when a will contains ambiguous terms, extrinsic evidence, such as the testimony of the attorney who drafted the will, is admissible to aid the court in construing the will. See Anderson v. Dubel, 580 S.W.2d 404 (Tex. Civ. App. 1979); Hultquist v. Ring, 301 S.W.2d 303 (Tex. Civ. App. 1957). In the instant case, the record contains several letters by Mr. Brooks, the attorney who drafted all of decedent's wills. The letters explain the significant provisions of decedent's will and provide insight into how decedent intended section 5.3 to operate. Mr. Brooks, in a letter dated September 29, 1986, explained to decedent that the special devise to Texas Tech was "the principal device [he] used in this draft * * * to avoid the consumption of the liquidity of the estate by death taxes due to the preponderant value of real estate as compared with liquid assets". Mr. Brooks continued with the explanation that section 2055 "severely" limits the feasibility of giving a life estate to persons who are not exempt from the Federal income tax and giving a remainder interest to a tax-exempt entity. Mr. Brooks quoted *304 section 2055(e)(1) and (2) and concluded: You will recognize the quoted material as the provision with which we had difficulty in the Hahl Proctor estate. I find it impracticable to conform a life interest in the Channing Ranch in favor of J. D. (Junior) Hays and wife, Beth Hays, or the survivor of them, with a charitable remainder annuity trust, a charitable remainder unitrust, or a pooled income fund, as briefly described in the above quotation, and more elaborately defined in sections 664 and 642(c)(5) Internal Revenue Code. The escape from this problem is found in the cross reference in the above quotation, "other than an interest described in section 170(f)(3)(B)". * * * Mr. Brooks concluded that section 170(f)(3)(B) provides an exception to the requirements of section 2055(e)(2) -- a devise of "a remainder interest in a personal residence or farm" -- which qualifies for a charitable deduction under section 2055(a). Accordingly, Mr. Brooks' proposed solution to the perceived problem was to have decedent devise his fee simple interest in the Channing Ranch to Texas Tech, but also make such interest subject to a lifetime lease option in favor of Mrs. Hays that *305 would require her to pay Texas Tech a market rate of rent. In such manner, Mr. Brooks counseled decedent that his estate would be entitled to a charitable deduction under section 2055(a)(1) because the devise of Channing Ranch to Texas Tech would meet the requirements of section 2055(e)(2) and section 170(f)(3)(B). Mr. Brooks concluded his analysis of the requirement of section 2055(e) and section 170(f)(3)(B) as follows: The key word in the above quotation is the word "farm" in subparagraph (B)(i). You may well ask why provide that J. D. (Junior) Hays and wife, Beth Hays, must pay rent to Texas Tech University for a grazing lease on the Channing Ranch. I have two reasons; namely, (1) It enables me to pass the fee simple title to the Ranch to the University immediately upon your death, thus distinguishing it from a remainder interest, which is a title postponed to a title having prior enjoyment, and (2) It should make the value of the interest passing to the Universitysubstantially the full value of the Ranch at date of death. A remainder interest must be valued by subtracting the value of the preceding life estate from the date of death value. The value of *306 the life estate is determined by applying a factor found in life tables published in the Internal Revenue Regulations to the full value, as of the inception of the life interest. Valuation of the interest passing to charity in that manner would result in an increased burden on the liquid assets of the estate to pay death taxes. If the University is to receive immediate title, subject only to an option to J. D. (Junior) Hays and wife, Beth Hays, to lease the premises for the only purpose for which it is definitely suited at the market value of such a lease, it can hardly be supposed that the value to the University is substantially less than it would be in the absence of the option. [Emphasis added.]
In a subsequent letter, dated August 9, 1988, to decedent's executor, Mr. Brooks stated that the primary purpose of section 5 of decedent's will was to ensure that the devise of the Channing Ranch to Texas Tech qualified for a charitable deduction under section 2055(a)(1): The structure of the will and its dominant intent is to avoid the creation of a charitable remainder trust. An additional argument that this result has been achieved may be made with reference to *307 the exclusion of family farms in the statutory restriction upon the deductibility of the value of the remainder interests in charitable remainder trusts. It is the clear intent of the will that no construction should be adopted relying solely upon the exclusion of family farms from the statutory restriction upon the deductibility of remainder interests in charitable trusts. The emphasis of the will is upon avoiding the creation of a trust which is a charitable remainder trust in either an economic or a legal sense regardless of the application of the family farm provision. [Emphasis added.]
With regard to section 5.3, Mr. Brooks stated: Section 5.3 of the will subjects the gift to Texas Tech University appearing in Section 5.1 thereof to a condition subsequent which will defeat such gift, "should it be finally determined by competent authority that the expected deduction is not allowed, whether under Section 2055(a)(1) or other provision of applicable law"; that is, should it be so determined that the value of the gift to the University is not deductible from the value of Foy Proctor's gross estate for determination of federal estate tax liability of the estate. *308 To insure that such adverse authoritative determination will not be made, the gift to the University is recited several times to be of the fee simple title vesting upon the death of the testator as provided in Section 37, Texas Probate Code, and the option to lease given to Beth Hays is so restricted as to provide for a rental conforming to the fair market value of the premises for grazing purposes, and for a rental and other terms not impairing the market value of the premises for grazing purposes. In order to effectuate the intent of the testator, it is essential that the option not be construed as a gift of a life interest in land, and that the gift to the University not be construed as a remainder interest in land. [Emphasis added.]
In light of the foregoing, we hold that decedent's primary intent was to devise his interest in the Channing Ranch to charity in a manner that would allow his estate to claim a substantial charitable deduction under section 2055(a) while allowing Mrs. Hays to remain on the Ranch. Accordingly, we hold that decedent "expected" that his estate would be entitled to claim a substantial charitable deduction for the devise of the Channing Ranch *309 to Texas Tech. We concluded, supra p.53, that petitioner would be entitled to a charitable deduction under section 2055(a) in the amount of $ 4,836,320, if the devise of the Channing Ranch to Texas Tech did not lapse under section 5.3 of decedent's will. A $ 4,836,320 deduction is slightly more than 80 percent of the value of the Channing Ranch on the date of decedent's death ($ 6,000,000). We believe that a deduction equal to approximately 80 percent of the fair market value of the Channing Ranch on the date of decedent's death is "substantial". Consequently, the special devise of the Channing Ranch to Texas Tech does not lapse under section 5.3 of decedent's will. We note one additional consideration. The manner in which decedent structured the devise of the Channing Ranch to Texas Tech did not create a charitable remainder trust in either a legal or economic sense. The devise of the Channing Ranch subject to Mrs. Hays' lifetime lease option did not give Mrs. Hays a life estate (or life interest) in the Channing Ranch, and the will did not give Texas Tech a remainder interest in the Ranch in either a legal or economic sense. The lifetime lease option granted to Mrs. *310 Hays is different than a life estate in that a life estate gives the beneficiary the right to use the property or the right to receive the income produced from the property for the duration of his or her life. In the instant case, Mrs. Hays' lifetime lease option merely gives Mrs. Hays the right to lease the property at a market rate of rent for the duration of her life plus 6 months. The lifetime lease option cannot reasonably be construed as the legal or economic equivalent of a life estate. Rather than a remainder interest in land, Texas Tech received full title to the Channing Ranch at the moment of decedent's death. Texas Tech is free to exploit its interest in the Channing Ranch in any manner that is compatible with Mrs. Hays' lifetime lease option. Consequently, we conclude that Texas Tech did not receive a remainder interest in the Channing Ranch and that decedent's will did not create a charitable remainder trust. We have considered the other arguments proffered by respondent, Mrs. Hays, and Ms. Baker and find them to be without merit. [29]
*311 To summarize, we hold that the special devise of the Channing Ranch subject to Mrs. Hays' lifetime lease option does not lapse under the terms of decedent's will and that petitioner is entitled to a $ 4,836,320 charitable deduction under section 2055(a)(1). In order to reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The parties have agreed that respondent's adjustment of the funeral expenses and other administrative expenses reported on petitioner's Federal estate tax return will be resolved in the proceeding under Rule 155 which the Court will order infra↩.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. From 1952 until 1984, the C Ranch was managed for decedent by Melvin and Carol Cotton. During 1984, decedent gave Melvin and Carol Cotton all of the ranch equipment and cattle he owned on the C Ranch. The land that comprised the C Ranch had been rented by decedent. Decedent's disposition of his interest in the ranch equipment and cattle located on the C Ranch is not in issue in the instant case.↩
1. Decedent required each donee to pay the applicable Federal gift tax.↩
2. Scott Baker is Clynice Baker's son.↩
1. The record does not indicate the nature of the gifts or whether decendent required each donee to pay the applicable Federal gift tax.↩
1. Decedent required each donee to pay the applicable gift tax.↩
4. The last Will and Testament of Hahl E. Proctor, dated Apr. 30, 1965, was also drafted by Richard S. Brooks. In her will, Hahl E. Proctor gave an equitable life estate in her assets to decedent and the remainder interest in such assets to the First National Bank of Midland, as trustee, to be held according to the terms of the testamentary trust created under her will. The testamentary trust provided that the income of the trust was to be used solely for charitable purposes. Her estate claimed a charitable deduction under sec. 2055(a)(1) equal to the value of the remainder interest devised to the testamentary trust created by her will. On audit, the IRS disallowed the deduction on the ground that the testamentary trust did not qualify as a charitable remainder annuity trust under sec. 2055(e)(2)(A). As a result of the audit, the testamentary trust was reformed so as to meet the requirements of sec. 2055(e)(3)↩.
5. The parties have stipulated that all prior wills were revoked by decedent, and that only the terms of decedent's 1986 will are controlling for purposes of the instant case.↩
6. For the period of May 28, 1988 (decedent's date of death), to Dec. 31, 1988, the $ 3.20 per acre rent was reduced to $ 2.56 per acre due to the fact that Mrs. Hays could not have stocked the ranch to full capacity prior to entering the grazing lease agreement with petitioner and Texas Tech.↩
7. Texas law incorporates the common law duties of a trustee where there is no specific statutory provision governing the trustee's conduct. Tex. Prop. Code Ann. sec. 113.051 (West 1992). Many States have held that a trustee has a fiduciary duty to deal impartially with all of the beneficiaries of the trust. See Scott & Fratcher, The Law of Trusts, sec. 183 (4th ed. 1987 & Supp. 1993) (citing Northern Trust Co. v. Heuer, 560 N.E.2d 961 (Ill. App. Ct. 1990) (denying a trustee's claim for attorney's fees and costs in a will construction suit where the trustee advocated a position favorable to one beneficiary but detrimental to another beneficiary)). In Estate of Smith v. Commissioner, 77 T.C. 326, 331↩ (1981), we also recognized that executors, administrators and other fiduciaries have an equal obligation of fidelity to all the beneficiaries of an estate.
8. Texas Tech did not join in this stipulation. Petitioner reported a $ 6,000,000 value for the Channing Ranch on its Federal estate tax return.↩
9. Texas Tech's valuation of $ 4,890,312 is based on the appraisal by Texas Tech's expert, who appraised the Channing Ranch subject to Mrs. Hays' lifetime lease option.↩
10. Sec. 5.1 of decedent's will devises his fee simple interest in the Channing Ranch to Texas Tech. Sec. 5.2 of the will states that the devise of the Channing Ranch contained in sec. 5.1 is subject to Mrs. Hayes' lifetime lease option.↩
11. All of the experts who testified in the instant case agreed that the fair market value of the Channing Ranch subject to Mrs. Hays' lifetime lease option is less than $ 6,000,000.↩
12. If Texas Tech's position is sustained, the devise of the Channing Ranch provided in sec. 5 of decedent's will would not lapse because the condition subsequent contained in sec. 5.3 of decedent's will would not have occurred.↩
13. Texas Tech cites Estate of Harrison v. Commissioner, T.C. Memo. 1987-8, as support for its position. Estate of Harrison involved a testator who owned a 1-percent general partnership interest and a 77.8-percent limited partnership interest in Harrison Interests, Ltd., a Texas limited partnership. The partnership agreement provided that the testator, as the general partner, had the right during his lifetime to dissolve and liquidate the partnership. The partner died without exercising his right of dissolution. In calculating the gross estate, the parties agreed that the testator's limited partnership interest was worth $ 59,555,020 with the right to force dissolution, but only $ 33 million without such right. Relying on the reasoning in United States v. Land, 303 F.2d 170 (5th Cir. 1962), we held that only $ 33 million was includable in decedent's gross estate. The Court reasoned that, at the moment of death, the limited partnership interest that passed to the testator's estate did not include the right to dissolve the partnership. Our holding in Estate of Harrison↩ is distinguishable from the facts of the instant case, in which the change in value is due solely to decedent's will which divides his ownership interest in the Channing Ranch among two beneficiaries.
14. Mr. Featherston calculated this figure by taking the terms of the current lease, which call for annual rental payments of $ 193,824, and subtracting ad valorem taxes, capital expenses, and other management fees the owner of the Channing Ranch will incur by virtue of owning the property.↩
15. Although the parties have stipulated that Mrs. Hays' life expectancy at the time of decedent's death was 24.5 years, Mr. Featherston estimated that Mrs. Hays would exercise her option to lease the surface rights of the Channing Ranch for a period of only 19 years. Mr. Featherston's estimate is based on his experience with long-term leases, which he claims are usually terminated prior to expiration of the lease period, frequently by means of a negotiated settlement with the owners of the underlying property.↩
16. Mr. Featherston used a 9-percent discount rate, but subtracted 4 percent in order to account for inflation.↩
17. Mr. Featherston concluded that the owner of the Channing Ranch would be able to sell hunting and fishing permits for $ 2 an acre.↩
18. Mr. Featherston estimated that a buyer would pay $ 7.50 per acre for the mineral rights beneath the Ranch.↩
19. Neither respondent nor Mrs. Hays and Ms. Baker have objected to the manner in which Texas Tech revised its estimate.↩
20. Mr. Featherston conceded that the $ 118,112 of intangible benefits derived from owning a big cattle ranch on the Texas panhandle is lost during the period of Mrs. Hays' lifetime lease option.↩
21. Texas Tech contends that Mrs. Hays' lifetime lease option has no monetary value because it requires her to pay a market rental.↩
22. Also known as the "income capitalization method".↩
23. Mr. Hayes assumed that the parties will negotiate a series of 5-year leases.↩
24. Mr. Hayes stated that the 14-percent discount rate was derived from a comparable sale of a ranch located near the Channing Ranch that was burdened by a 3-1/2-year lease. Mr. Hayes testified that the investor who purchased the ranch anticipated a 14-percent return on his investment. Mr. Hayes stated that the 14-percent return the investor anticipated when he bought the ranch included the cost of buying out the lessee.↩
25. One transaction Mr. Austin offered as a comparable sale was that of a ranch located in Jim Hogg County in south Texas that was encumbered by both grazing and hunting leases. Another transaction involved the sale of a ranch in Jeff Davis County which is located in western Texas and was encumbered by only a hunting lease. The Channing Ranch is located in Oldham and Hartley Counties, which are located on the Texas panhandle. Mr. Austin testified that he did not physically survey the ranches that formed the basis of his comparison. Consequently, Mr. Austin was unable to assess whether such ranches were similar to the Channing Ranch. Also, Mr. Austin was not aware of whether there were valuable mineral deposits located below the surface of the two ranches he compared.↩
26. We note that the Mr. Smith's selection of an 11-percent discount rate when applying the "conventional lease analysis" method reflects the investment value to the typical investor because the 11-percent discount rate was based upon the rate of return of similar investments at the time of decedent's death. Therefore, the "investment differential" method is superfluous for purposes of the instant case.↩
27. Investment value and market value may coincide if an investor's investment criteria are typical of investors in the market, but the two types of value are not necessarily interchangeable. Appraisal Institute, The Appraisal of Real Estate 413 (10th ed. 1992).↩
28. All of the other experts who testified in the instant case, with the exception of Mr. Austin, relied exclusively on the "conventional lease analysis" method.↩
29. Mrs. Hays and Ms. Baker argue that the charitable contribution deduction should be disallowed under sec. 20.2055-2(b)(1), Estate Tax Regs., because the possibility that the devise of the Channing Ranch will lapse is not so remote as to be negligible. Respondent did not raise this argument in her notice of deficiency, and she did not argue this position on brief. Mrs. Hays and Ms. Baker also argue that if we find petitioner is entitled to a partial deduction, but no lapse occurred, Texas Tech should be required to pay the additional estate tax due. Neither respondent nor petitioner has raised either of these issues for decision. Consequently, we do not decide them. We granted Texas Tech and Mrs. Hays and Ms. Baker the right to intervene on only two issues, the value of the Channing Ranch includable in decedent's gross estate and the value of the charitable deduction petitioner is entitled to claim under sec. 2055↩, if any.